HERBERT M. ROGERS, ADMINISTRATOR OF THE ESTATE OF WALTER J. FAIRBANKS, DECEASED, v. HENRY S. ROBINSON ET AL.

*Confusion of goods—Evidence—Conversion by mortgagee—Estoppel—Pleading—New trial.*

1. A father moved a stock of goods valued at $1,300, which he claimed to own, to a neighboring city, where his daughter engaged in business. The daughter made large additions to said stock, and about seven months after such removal mortgaged the entire stock to a firm of whom she had been purchasing goods. The mortgagees seized the goods, and the father sued in trover for their value. On the trial plaintiff only claimed to recover for the original stock of goods, but offered no testimony tending to show the amount or value of such portions of the original stock as remained at the time of the foreclosure, or that any of said goods were then on hand, and no attempt was made to show that such proof could not be made or that it was difficult to make it. And it is held that the presumption would be that the original stock would be reduced by sales, and that a verdict for the plaintiff for $800 was therefore merely conjectural.

2. The original stock of goods was placed in and as a part of the business carried on by the daughter, and the goods were used as a basis for credit, to the knowledge of the father. The clear preponderance of evidence was in favor of the contention of the mortgagees that they had no notice that the father claimed an interest in the mortgaged property. And it

is held that the motion of the defendants for a new trial should have been granted.

3. The defendants were entitled to avail themselves of the estoppel on the part of the plaintiff under the plea of the general issue; citing *Eureka Iron & Steel Works v. Bresnahan*, 66 Mich. 489.

Error to Ingham. (Person, J.) Submitted on briefs February 14, 1895. Decided ·March 12, 1895.

Trover. Defendants bring error. Reversed. The facts are stated in the opinion.

*M. V. & R. A. Montgomery,* for appellants.

*Q. A. Smith,* for plaintiff.

McGRATH, C. J. On August 17, 1891, Sarah Fisher executed to defendants a chattel mortgage in the sum of $1,967.19 upon a stock of boots and shoes in a store at Lansing. The stock was afterwards sold by defendants under said mortgage. Plaintiff, as administrator of Walter J. Fairbanks, brings trover for the conversion of the stock.

Fairbanks was the father of Sarah Fisher. The shoe business had formerly been carried on at Stanton under the name of Ann˚ Fairbanks & Co., a firm composed of the wife and one Woodruff, a son-in-law, of Walter J. Fairbanks. The stock there was claimed to be worth about $1,300, but was subject to a mortgage of $400 to one Salisbury. The mortgagee threatened to foreclose, but under some arrangement with him the stock was brought to Lansing, where a store was opened in January, 1891, which was known as the "Fisher Shoe House," carried on in the name of Sarah Fisher. On behalf of Walter J., it is claimed that, although the business had been carried on at Stanton in the name of his wife and son-in-law, he was the real owner, and that the real object was to pro-

tect himself against a pending judgment.  After the goods were brought to Lansing, Guion T. Fisher, husband of Sarah, claimed to be the real proprietor, but a judgment was pending against him also.  However, Guion took charge of and managed the business at Lansing.  Large quantities of merchandise were added to the stock, were bought in the name of and billed to Sarah Fisher, and shipped to the Fisher Shoe House.  The mortgage to defendants was for goods purchased after the removal to Lansing.  Sarah was held out to the commercial agencies, and to the parties with whom dealings were had, as the owner of the stock and business.  In the rear of the store Fairbanks had a bench, and did the cobbling for the business.  He says that Fisher ran the front end of the store, and had charge of it, and made the purchases for it; that he ran it in the name of the Fisher Shoe House.

"Q. Who was the party that Mr. Fisher was representing whom the goods were purchased for?  In whose individual name were the goods purchased?

"A. Well, I really could not tell you that, because he never opened his head to me.

"Q. You knew that he was running the business and making purchases there in the store?

"A. Yes, sir.

"Q. And making large purchases from various wholesale houses?

"A. I could not tell you that.

"Q. You knew that Henry S. Robinson & Co. had sold Mrs. Fisher a large amount of goods there, did you not, from time to time?

"A. Well, I could not tell you the amount.

"Q. Well, you knew that they had sold her goods from time to time?

"A. Yes, sir.  *  *  *

"Q. From the time you commenced there, then, in that store, Mr. Fisher had charge of all purchases, didn't he, up to the time Henry S. Robinson & Co. took possession?

"A. Yes, sir; he took the charge of it.

"Q. And it was run in the name of the Fisher Shoe House all that time?

"*A.* Yes, sir.

"*Q.* And the purchases which were made from Henry S. Robinson & Co. by Mr. Fisher were made in the name of Mrs. Sarah Fisher, weren't they?

"*A.* Yes.   *   *   *

"*Q.* You say they belonged to you privately. What do you mean by that?

"*A.* I always owned them; I always carried on a shoe shop.

"*Q.* You didn't put those into the stock of goods at all,—into the general business?

"*A.* Yes, sir; I think they were put in, but I don't remember; I would not say for that.

"*Q.* Now, Mr. Fairbanks, other purchases that were made there were made in the name of Mrs. Fisher from other wholesale houses?

"*A.* Yes, sir.

"*Q.* All the purchases which were made after the business was opened were made in the name of Mrs. Fisher?

"*A.* Yes, sir.

"*Q.* And the business was conducted in her name, as the proprietress? That is correct?

"*A.* Yes, sir.   *   *   *

"*Q.* What did you mean by telling me that the goods were ordered in Mrs. Fisher's name?

"*A.* Well, of course, I didn't know what he ordered; he hardly ever told me what he did order.

"*Q.* In her name,—it was in her name?

"*A.* I don't know anything about it.

"*Q.* You supposed he was ordering them in his wife's name?

"*A.* No, sir; I didn't suppose anything."

Ann Fairbanks died in April, 1891.

A verdict should have been directed for defendants. There was no basis for a verdict against them.

1. The sole claim made by plaintiff was that the goods which were originally put into the store belonged to Walter J. Fairbanks, and it was for the value of these goods that a recovery was sought. The declaration was for a stock of goods. The business had been carried on for about seven months when the mortgage was given. The entire stock brought on foreclosure nearly $1,500,

which was about 65 per cent. of the inventoried value. There was no testimony offered tending to show the amount or value of such portions of the stock, alleged to have been put into the store by Fairbanks, as remained at the time of the foreclosure, or that any of said goods were still on hand at that time, and no attempt to show that such proof could not be made, or that it was difficult to make it. The presumption would be that the amount would be reduced by sales. *Bethel v. Linn*, 63 Mich. 464. The verdict of the jury of $800 was therefore merely conjectural.

2. Walter J. Fairbanks alleged that he owned the stock at Stanton, and at the time that the goods were put into the store at Lansing. There is no evidence of any understanding or agreement that Walter J. should retain the title to the goods, or that the specific goods should remain his property, and no evidence that Sarah Fisher or Guion T. should account or did account for the proceeds thereof; but, on the contrary, the evidence clearly tends to show that the goods were turned in as a part of the business which was thereafter to be carried on by Sarah Fisher, and were thereafter to be dealt with as her property, and were so dealt with. Walter J. says:

"*Q.* What arrangement, if any, did you bring them here under, with Mr. Fisher?

"*A.* Under Salisbury, that he would not foreclose if I would allow him to come down here and sell it out, and pay him, and that he would rent a room and sell it at cost; and then, when I got down here, they had made different arrangements. Salisbury wanted to get rid of his building, and Fisher bought some goods and put in with them.

"*Q.* State the arrangement distinctly under which you brought the goods down here and put them in the store.

"*A.* Well, the arrangement was they were to come down, and rent a room, and sell them off at cost until this $400 mortgage was paid off, and I agreed to do that."

He does not attempt to give any further explanation.

Guion T. Fisher says that the business was carried on in his wife's name.

" *Q.* What basis of credit did you offer those houses when you obtained credit?

" *A.* I offered the fact that I had $1,100 worth of goods there.

" *Q.* And it was a stock of goods that has been mentioned, was it not?

" *A.* Yes, sir. * * * I stated that my wife owned the stock of goods at the other trial. It seems to me that I ought to be permitted to make a statement in regard to that. They distinctly understood—Robinson's people distinctly understood—why that business was done in my wife's name. Them and myself had a talk there in their house. Mr. Paxton was there; and I told them at the time it was not my wife's goods, because she never invested anything in it. It was simply put there for protection of me. Robinson's people understood that, and went to the courts at Detroit to investigate the matter over a judgment that was over me. That was what I said, because I supposed it was to protect Mr. Robinson's people from loss. * * * The stock was taken by me to get out of it what I could. * * *

" *Q.* Did your father-in-law understand that they were turned over to you to add to and conduct the business there?

" *A.* Why, he understood the business; yes, sir.

" *Q.* And he understood that you were obtaining credit on the strength of that business, did he?

"*A.* Why, yes; he must have understood that. He understood the way the business was done. Mr. Salisbury had a mortgage on the stock at Stanton. He threatened to foreclose, and turned the goods over to me, and held me responsible for them."

It appears that Salisbury held as collateral a policy of insurance upon a house in Stanton, owned by Ann Fairbanks. The house was destroyed by fire, and Salisbury assigned his interest in the policy to the witness, who says that out of the proceeds of the policy he paid off the mortgage on the stock of goods.

3. This stock of goods was placed in and as a part of

the business carried on by Sarah Fisher. It was used as a basis for credit, and knowledge of this fact was brought home to Walter J. Fairbanks. The clear preponderance of evidence was in favor of defendants as to the fact of notice to them that Walter J. Fairbanks had or claimed an interest in the goods in question, and the court should have granted the motion for a new trial. The only testimony pointing towards plaintiff's theory of notice was that of a son of Walter J. Fairbanks, who was a mere clerk in the store for two or three months, and who says that on one occasion, in the presence of Mr. Woodruff, Mr. Fisher, Mr. Paxton (defendants' salesman), witness, and his father,—

"We told him [Paxton],—Fisher and myself,—we talked it over, and told him that the goods that were in there belonged to the old gentleman individually himself, and told him the reason why that they were; and he understood it, and so did Mr. Robinson, I supposed. * * * Well, we both gave him to understand who that stock belonged to. It belonged to the old gentleman individually himself, and the reason why it was, Salisbury and Fisher came up there and was going to foreclose the mortgage if he didn't bring it down here and let Fisher run it; that he would foreclose the mortgage, and rather than lose the stock he brought it down here, and let Fisher run it under his wife's name."

Walter J. does not allude to any such conversation. Woodruff is called, but does not support the witness. Fisher, who managed the business and had ample authority, does not corroborate him, and does not attempt to say that he informed Paxton or defendants that Walter J. Fairbanks had or made any claim to any part of the stock. He says that he told Paxton that the stock was the balance of the Ann Fairbanks & Co. stock, but that he also told him that he owned the stock, and desired the business to be conducted in his wife's name, in order to protect himself from an existing judgment. He identified a letter

which he wrote to defendants from Lansing, dated January 29, 1891, in which he says:

"Your letter of the 28th inst. is at hand, and in reply would say that my wife is the one to charge the goods to, for the reason that it protects you against any loss, and protects me from being troubled from the old judgment rendered against G. T. Fisher & Co., of Detroit. My wife has all we have in her name, and will continue to until I have this judgment canceled, which I hope to do some future day. I made a full statement to the Dun's Reporting Agency of our assets, and supposed you would refer to them. She has $1,300 worth of boots and shoes free of debt; $300 worth of heel-support stock, her half; and a mortgage for $300 at 7%, running three years, on village property in Stanton."

This letter was written at the commencement of the dealings between the Fishers and defendants, by the manager of the business,—the party who was placed in charge of the stock and store, who looked after the credit, and made all purchases,—and is better evidence of the fact as to what representations were made to defendants than the uncorroborated statement of a clerk, who alleges that the conversation to which he testifies was had in the presence of this same manager.

There is no force in the objection that defendants could not avail themselves of the estoppel under their plea of the general issue. *Eureka Iron & Steel Works v. Bresnahan,* 66 Mich. 489.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.