CROWLEY BROTHERS *v.* GRAND TRUNK RAILWAY CO. OF CANADA.

1. CARRIERS—STORAGE OF BAGGAGE—LIABILITY FOR LOSS—FIRE, DESTRUCTION BY.

   The question of the reasonableness of time within which to claim baggage in possession of a carrier is ordinarily a question for the jury upon disputed facts: the facts being admitted or not disputed the question is one for the court.

2. SAME—CUSTOM—EVIDENCE—BAGGAGE—LIABILITY.

   Where a traveling salesman left his baggage and sample cases in the depot of defendant railway company overnight after his arrival at his destination, and there was evidence that it was customary for the carrier to close its depot very soon after the arrival of the evening train, upon which plaintiff's salesman arrived, so that there was no opportunity to procure the baggage until the next morning, the failure of the passenger to apply for his baggage until the next day was not a defense to an action for its loss by fire during the night.

3. SAME—TRIAL—CHARGE—CUSTOM.

   Although the court submitted to the jury the question whether or not such custom existed, the evidence, being uncontradicted, warranted an instruction to the jury that a reasonable time had not elapsed; and where the jury found under the charge that a reasonable time had not elapsed so that defendant was chargeable as a common carrier, or that a reasonable time had elapsed, and defendant was guilty of negligence, there was no reversible error of which defendant could complain.

4. PLEADING — DEFENSE — AFFIRMATIVE DEFENSE — LIMITATION OF LIABILITY—CARRIERS.

   Circuit Court Rule 7b, providing that any affirmative defense, such as payment, release, discharge, etc., must be pleaded, authorized the trial court in rejecting from the evidence an exhibit offered by defendant to show that its liability had been limited by a published schedule of rates on file in its office; the general issue is not sufficient to justify the admission of testimony to show a

limitation of the carrier's liability. 3 Comp. Laws, §§ 10073, 10074 (5 How. Stat. [2d Ed.] §§ 12723, 12724).

5. CARRIERS—BAGGAGE—NOTICE.

Where the plaintiff's traveling salesman in good faith checked his sample cases without declaring their actual value and obtained a lower rate than he was entitled to for the baggage, and where the tariff schedules on file in the carrier's office provided for a limitation of liability unless a greater sum was stated and extra charges paid, but the rates were not brought to the passenger's attention and were not known to him, the carrier was liable for the full value upon their destruction by fire in its depot within a reasonable time after arrival under Act No. 300, Pub. Acts 1909, § 40.

6. CARRIERS — LIABILITY — BAGGAGE—NEGLIGENCE—DAMAGES—LOSS BY FIRE.

Act No. 300, Pub. Acts 1909, which expressly preserves the common law liability of carriers, does not relieve a carrier of its liability to one whose baggage was, without fraud or deceit, checked under a lower rate than that kind of goods should have paid if their value and nature had been declared.

Error to Wayne; Van Zile, J. Submitted November 23, 1914. (Docket No. 153.) Decided April 19, 1915.

Case by Crowley Brothers against the Grand Trunk Railway Company of Canada for destruction of certain baggage. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harrison Geer*, for appellant.

*Lucking, Helfman, Lucking & Hanlon*, for appellees.

STONE, J. This is an action of trespass on the case brought by the plaintiff, a wholesale dry goods corporation, with its principal place of business in the city of Detroit, to recover the value of seven sample trunks, together with the contents thereof and inter-

est thereon, from the defendant, which operated the Michigan Air Line Railway under a lease. The trunks and contents thereof belonging to the plaintiff were destroyed, on the evening of July 5, 1910, while deposited in defendant's depot at Stockbridge, Mich., by being consumed by fire. Stockbridge is a village of 600 or 700 inhabitants, and is located on the Michigan Air Line Railway. One Charles Nuthall was employed on the day in question as a traveling salesman for plaintiff, and carried a general line of dry goods merchandise. He had been carrying such line from the October previous, and for a period of five or six years prior to that time traveled for plaintiff with a special line of dry goods. Since the previous October his territory had been a portion of the State of Michigan, and he made towns along the line of the Michigan Air Line Railway. Among them were the villages of Pinckney and Stockbridge. He had spent the day of July 5th at the village of Pinckney, and had used his sample trunks, at a hotel in that village, in connection with his trade. He desired to take defendant's passenger train No. 29 west for Stockbridge that evening. This train was scheduled out of Pinckney at approximately 8 :44 p. m. About 7 o'clock that evening Mr. Nuthall telephoned defendant's station agent at Pinckney, and informed him that he would send his sample trunks down to the depot for No. 29, and he desired to go to Stockbridge, and gave the agent the excess weight of his baggage, and requested him to have the checks covering the baggage ready when he arrived at the depot in order to save delay. His request was complied with. He could not state how much was paid by him for excess baggage, but the agent, upon the trial, produced his railroad records, which showed that on the evening in question he had checked four pieces of baggage from Pinckney to Stockbridge on train No. 29, covered by the following

checks: No. 623,984, No. 623,985, No. 623,986 and B/4,434. The latter check is what is known as an excess baggage check. The records showed the excess weight upon the four pieces of baggage to be 650 pounds, and that the rate charged was 10 cents per hundredweight, and the amount collected was 65 cents. Defendant had on file at its passenger depot at Pinckney, Local and Joint Tariff No. T-2, covering rates on excess baggage from western division in Michigan to stations in Michigan on the Grand Trunk Railway System and connecting lines, issued at Chicago, Ill., May 5, 1910, effective May 16, 1910, which tariff was in effect on July 5, 1910, as appeared from the certificate of the secretary of the Michigan Railroad Commission. It was marked "Exhibit 3."

"TABLE OF EXCESS BAGGAGE RATES.

"The minimum charge for any shipment of excess baggage must be 25 cents.
When Passenger Fare is

| From | To | Excess Rate per 100 lbs. |
|------|------|------|
| $0.01 | $0.20 | $0.08 |
| .21 | .40 | .10 |
| .41 | .60 | .12 |

"Sample Trunks and Cases.

"Trunks or cases containing samples of merchandise may be checked when accompanied by the owner or agent, and 150 pounds carried without extra charge, but this company will not be responsible in any amount exceeding $100.00 for the loss or damage to such property, unless a greater sum is agreed upon at the time of checking. All in excess of 150 lbs. will be charged for at the same rate as excess baggage, regardless of the number of tickets presented, except when it is clearly shown that the commercial traveler is regularly accompanied by an assistant or helper traveling with him and employed by the same firm, 150 pounds additional will be carried free.

"Excess baggage checks will be issued for amounts collected in all cases for increased value stipulated.

"Stipulated Valuation.

"If any passenger stipulates for a greater sum than $100.00 for an adult, or $50.00 for a child, to be paid in case baggage is damaged, destroyed or lost, the charge for the increased valuation will be one-half of the current excess baggage rate per 100 lbs. of excess baggage (for the distance carried) for each $100.00 or fraction of $100.00 for the increased value stipulated, adding enough when necessary to make the rate end in zero or five. No charge less than 25 cents to be made.

"Limited Liability.

"This company will not be responsible in any sum greater than $100.00 for loss of or damage to baggage belonging to an adult passenger, or $50.00 for baggage for a child, unless a greater sum is stipulated and excess charges paid for increased valuation at time of checking."

Mr. Nuthall knew the rate upon excess baggage was governed by the price of the ticket, and that where the fare was from 1 cent to 20 cents the rate was 8 cents per 100 pounds, and where the fare was from 21 cents to 40 cents the rate upon excess baggage was 10 cents per 100 pounds, and so on. He knew that defendant had a tariff covering those charges for carrying excess baggage. The fare from Pinckney to Stockbridge was substantially 40 cents. Mr. Nuthall made no claim, when checking his baggage and paying the excess rate, that it was worth to exceed $100, and his testimony is undisputed that he did not know of a regulation or rule providing for different rates on excess baggage. Upon that subject he testified as follows:

"*Q.* Did you know at this time that there was any rule or regulation relative to the limitation of the liability of the railroad company to $100?

"*A.* No, sir.

"*Q.* Was your attention challenged to any such liability, or called to it on that day, or was it mentioned to you?

"*A.* No, sir."

Mr. Nuthall took defendant's passenger train No. 29 from Pinckney to Stockbridge, his trunks going upon the same train. The trunks were put off in the usual manner at the depot. Mr. Nuthall observed them upon the depot platform before he left to go uptown. He said nothing to the agent or his helper at Stockbridge that evening. Leaving the train he went immediately to the waiting bus and was taken to his hotel. The checks for the trunks were given by Mr. Nuthall to the busman, who ran a dray line in connection with his bus line, and Mr. Nuthall instructed him to deliver the trunks to the hotel the following morning. Upon that subject he testified, upon cross-examination, as follows:

"*Q.* You did not intend to take your trunks away from that depot that night?

"*A.* I did not intend, did you say?

"*Q.* No; you were going to leave your trunks until the next morning; that was your intention?

"*A.* My intentions were governed to a certain extent by whether the drayman wanted to bring them that night or not.

"*Q.* You did not ask the drayman to deliver your trunks to you that night?

"*A.* The drayman asked me—

"*Q.* No; answer my question.

"*A.* I did not.

"*Q.* What did the drayman ask you?

"*A.* He asked me if it would be all right to bring them in the morning. It was late, and the depot would close directly after the train left. I told him it would, if he would bring them over early in the morning. He was to bring my baggage to the sample room at the hotel.  *  *  *  I did not make any request of the depot man at Stockbridge to leave his depot open to give a drayman an opportunity to take my trunks away that night. It was my purpose to take all my trunks up to town the next morning. I delivered my checks to the drayman; the busman, who was also the drayman. One man operates both wagons there, or did up to that time anyway."

The defendant's helper and baggageman at Stockbridge, among other things, testified as follows:

"*Q.* State whether or not it was customary for traveling salesmen coming in on that train to leave their sample trunks in the depot overnight.  *   *   *
"*A.* It was customary.
"*Q.* And that custom had prevailed for some time, had it, in Stockbridge?
"*A.* Yes, sir."

Mr. Nuthall, on his direct examination, had also testified as follows:

"*Q.* What had been your custom and practice from the previous October of 1909 down to July 5, 1910, about what you would do with your trunks when you came into Stockbridge on that train?"

Objection having been made to this question, the court said:

"Go ahead; you may answer the question; I understand you are inquiring the custom and practice that is understood and acquiesced in by the carrier at Stockbridge?
"*Plaintiff's Attorney:* Yes, your honor.
"*The Court:* That is the custom of both of these people?
"*Plaintiff's Attorney:* Yes, your honor.
"*The Court:* Not his particular custom?
"*Defendant's Attorney:* His custom would not bind us. His particular custom could not possibly bind the carrier without its being acquiesced in and understood by the carrier and accepted.
"*Plaintiff's Attorney:* That is what I want, the custom that is understood by the carrier, by the railroad company itself, as you understand it, and that was acquiesced in and followed from the previous October down to this time in relation to your trunks.
"*A.* Getting in on a late train we had always left them there overnight.  *   *   *
"*Q.* What would the baggage agent do with the trunks when you did that?  *   *   *
"*A.* Put them in the baggageroom, and keep them there overnight.

"*Q.* Had that been the case since the previous October, down to this date?

"*A.* Yes, sir."

The baggageman's helper at Stockbridge was on duty alone when No. 29 arrived on the evening in question. He stayed at the depot until all the passengers who had come in on that train left, and then put the trunks, including those of plaintiff's, into the waiting room of the depot, the baggageroom being too small to care for all of the trunks. He then locked the depot and went home for the night, there being no more passenger trains scheduled to arrive at that station that evening, and Stockbridge was not a 24-hour station. He testified that had he been requested he would have remained at the depot to permit Mr. Nuthall's trunks to have been taken to the hotel that evening, but Mr. Nuthall made no request to wait until he could get the trunks. The night was a very warm one. Defendant's depot was discovered on fire about half an hour after it had been closed. It was a wooden structure, and the building, together with plaintiff's trunks, was entirely consumed. Plaintiff brought suit to recover the value of seven sample trunks and their contents. The records of the defendant showed but four pieces of baggage were checked. There was a disputed question of fact as to whether there were seven or four trunks. The jury, by their verdict, found that plaintiff had but four trunks and their contents consumed. The declaration contained five counts. Four of them charged negligence on the part of the defendant. The plea was the general issue. Upon the trial plaintiff offered testimony tending to show that the fire arose from spontaneous combustion, caused from ignition of oil and waste kept in the baggageroom.

The trial court submitted the following propositions to the jury by its charge:

(1) Was defendant a carrier, or warehouseman of plaintiff's trunks?

(2) Was the fire started by spontaneous combustion?

The jury rendered a verdict in favor of the plaintiff in the sum of $815.77, which included the value of the four trunks, contents thereof, and interest thereon. Judgment was entered thereon. The defendant has brought the case here upon writ of error, and by appropriate assignments of error its counsel claim that the court erred in the following particulars:

(1) In the refusal to instruct the jury, as requested, that defendant was not a carrier of the trunks in question, but was a warehouseman and only liable for negligence; (2) refusal of the trial court to permit defendant's Exhibit No. 3 to be introduced in evidence; (3) refusal of the trial court to instruct the jury, as requested, to the effect that plaintiff could not, in any event, recover more than the sum of $100 as the value of the trunks and contents.

1. It is the claim of defendant that the question of whether defendant was a common carrier or warehouseman was, under the testimony, a question of law and not of fact; the facts being undisputed. It is urged that the rule of law in this State is now settled, to the effect that a railroad company continues as a common carrier of baggage after its arrival at destination until a reasonable time has elapsed for delivery, and after such reasonable time its liability is that of a warehouseman, and it is not an insurer, but liable only for negligence. Defendant's counsel did not, in their brief, nor did they at the hearing, argue the question whether there was evidence of negligence on the part of the defendant, as the cause of the fire. It is the claim of the plaintiff that in determining whether a reasonable time had elapsed for the removal of plaintiff's baggage, and whether the defendant's liability had been changed

thereby from that of a common carrier to that of a warehouseman, the usage, custom, or course of business may, and should, be considered; and if it should appear that a custom exists whereby the common carrier retains the baggage overnight, then such custom becomes one of the important circumstances to be considered in determining whether or not a reasonable time had elapsed for the delivery of the package.

Counsel on both sides have referred to *Wallace* v. *Railway Co.*, 176 Mich. 128 (142 N. W. 558). This court there held, in substance, that the strict rule of liability for baggage of passengers continues after arrival of the passenger at his destination, and until the lapse of a reasonable time thereafter; what is a reasonable time is a question of fact for the jury, if there is any dispute about the facts. In that case Justice McAlvay, speaking for the court, referred to 3 Am. & Eng. Enc. of Law (2d Ed.), p. 565, and cases there cited. It is there said:

"The troublesome question in this connection is as to what constitutes such reasonable time, and must be determined from all the circumstances of the case, such as the character of the station, the facilities there for receiving baggage, and the opportunities afforded by the carrier for delivering baggage when called for."

This question is largely one for the jury upon all the facts of the case, but when the facts are not disputed it is for the court to decide. In determining the question the jury must take into consideration all the circumstances shown by the evidence bearing upon that question, and the general and usual custom or manner in which the company transacted its business in relation to such baggage at the depot in question in regard to the delivery of such baggage.

In applying the rule that the liability of a carrier continues for such a reasonable time after the arrival of the train as is necessary to effect delivery, it is

necessary to determine what constitutes a reasonable time, and upon this point there is considerable difference of opinion. While it is said that the question is a mixed one of law and fact, if the facts only are in dispute it is a question for the jury, and one which is necessarily dependent upon the circumstances of each particular case. When the facts are in dispute the jury should decide, under the instruction of the court as to the law, and where the facts are undisputed, it is purely a question of law, and the court should decide it. In determining what is a reasonable time with respect to custody of baggage after it has reached its final destination, the course of business and practice of the carrier constitute an important element in the question. If it is customary for a carrier to close its depot so soon after the arrival and departure of an evening train that the baggage handlers do not customarily go to the depot at night, the failure of the passenger to remove his baggage until the next morning does not necessarily relieve the carrier from its liability as such in the interim. 5 Ruling Case Law, p. 216, and cases cited.

We have examined the cases cited by counsel for both parties. There is much force in the position taken by plaintiff's counsel that the custom of leaving baggage overnight was shown in this case by uncontradicted evidence; and upon that question the court might well have instructed the jury that the defendant was liable as a common carrier. We think the court should have so charged. However, the court permitted the jury to determine whether a reasonable time had elapsed, and, if so, whether there was any negligence for which defendant was liable as a warehouseman. The jury found, either that a reasonable time had not elapsed, and that defendant was liable as a common carrier, or that such time had elapsed, and defendant was guilty of negligence. In other

words, defendant was not prejudiced by the submission to the jury.

An examination of the authorities leads us to the conclusion that no error was here committed of which the defendant can complain, as we find there was some evidence in the case upon the question of negligence, and sufficient upon that subject to carry the case to the jury. The following cases refer to the subject of custom: *Geo. F. Dittman Boot, etc., Co.* v. *Railway Co.*, 91 Iowa, 416 (59 N. W. 257, 51 Am. St. Rep. 352) ; *Tallman* v. *Railway Co.*, 136 Wis. 648 (118 N. W. 205, 16 Am. & Eng. Ann. Cas. 711) ; *McCoy* v. *Railroad Co.*, 84 S. C. 62 (65 S. E. 939) ; *Ouimit* v. *Henshaw*, 35 Vt. 605 (84 Am. Dec. 646) ; *Powell* v. *Myers*, 26 Wend. (N. Y.) 591; *Moffat* v. *Railroad Co.*, 123 App. Div. 719 (107 N. Y. Supp. 1113).

2. As to the refusal of the trial court to permit defendant's Exhibit No. 3, being the tariff schedule, to be introduced in evidence, it was objected to upon the trial by plaintiff's counsel that this document and the evidence relating thereto were not admissible under the plea of the general issue; that in a tort action like the present against a common carrier to recover for loss of baggage, the defendant cannot rely upon a special contract limiting liability, unless the same has been specifically or affirmatively pleaded. Our Circuit Court Rule 7b provides as follows:

"An affirmative defense, such as payment, release, satisfaction, discharge, license, fraud, or failure of consideration in whole or in part, and any defense which by other affirmative matter seeks to avoid the legal effect of, or defeat the cause of, action set forth in plaintiff's declaration, must be plainly set forth in a notice added to the defendant's plea."

This rule took effect January 1, 1897, and was adopted by this court in pursuance of the provisions of section 10074, 3 Comp. Laws, which reads as follows:

"The Supreme Court may make such rules in relation to notice of matters intended to be given in evidence by either party, as shall be necessary to prevent surprise, and to afford opportunity for preparation for trial."

This rule has been applied by this court in the following cases: *Bryant* v. *Kenyon*, 123 Mich. 151 (81 N. W. 1093) ; *Walbridge* v. *Tuller*, 125 Mich. 218 (84 N. W. 133) ; *Putze* v. *Insurance Co.*, 132 Mich. 670 (86 N. W. 814, 94 N. W. 191) ; *R. K. Carter & Co.* v. *Weber*, 138 Mich. 576 (101 N. W. 818) ; *Scott* v. *Longwell*, 139 Mich. 12 (102 N. W. 230, 5 Am. & Eng. Ann. Cas. 679) ; *Richardson & Co.* v. *Noble*, 143 Mich. 546 (107 N. W. 274) ; *Baumler* v. *Insurance Co.*, 148 Mich. 430 (111 N. W. 1069). The following cases in other jurisdictions bear upon this subject: *Aultman Co.* v. *Railway Co.*, 143 Iowa, 561 (121 N. W. 22) ; *Michalitschke* v. *Wells Fargo & Co.*, 118 Cal. 683-689 (50 Pac. 847) ; *Chicago, etc., R. Co.* v. *Dunlap*, 71 Kan. 67 (80 Pac. 34) ; *Missouri, etc., R. Co.* v. *Grocery Co.*, 55 Kan. 525 (40 Pac. 899) ; *Lacey* v. *Railroad & Navigation Co.*, 63 Or. 596 (128 Pac. 999) ; *Nashville, etc., R. Co.* v. *Parker*, 123 Ala. 683 (27 South. 323) ; *St. Louis, etc., R. Co.* v. *Wilson*, 85 Ark. 257 (107 S. W. 978) ; *Deierling* v. *Railroad Co.*, 163 Mo. App. 292 (146 S. W. 814). A reference to the above cases will show that they sustain the position claimed by the plaintiff. In our opinion the claimed defense, seeking to restrict the liability of the carrier, was not admissible under the general issue. Upon this subject the defendant's counsel cite the cases of *Eureka, etc., Steel Works* v. *Bresnahan*, 66 Mich. 489 (33 N. W. 834), and *Rogers* v. *Robinson*, 104 Mich. 329 (62 N. W. 402). It evidently escaped the attention of counsel that both of these decisions were made before the adoption of Circuit Court Rule 7, which materially changed the practice upon that subject.

3. What we have already said disposes of defendant's claim under this head. It may be said, however, that, it appearing that there was no fraud or deceit on the part of the plaintiff in checking the baggage, we think the case is controlled by *Farnsworth* v. *Express Co.*, 166 Mich. 676 (132 N. W. 441), where reference is made to the proviso in section 40 of Act No. 300, Pub. Acts 1909, being the last clause of said section, which reads as follows:

"*Provided,* that nothing herein contained shall be so construed as to abridge or in any wise lessen the liability of any such common carrier as it now is under existing laws." .

This court said:

"In view of the proviso of section 40, above quoted, we are of opinion that it was not the intention of the legislature to change the common-law liability of carriers as it had existed prior to the passage of the act."

Unless we are to overrule the *Farnsworth Case*, it must be held to be controlling of this question, notwithstanding the rulings of the Supreme Court of the United States in *Boston, etc., Railroad* v. *Hooker*, 233 U. S. 97, 34 Sup. Ct. 526, and kindred cases relating to the interstate commerce act and its amendments, which latter act differs materially from the Michigan act, above referred to, and contains no such proviso as that above quoted. So, in any view of the case which we are able to take, we are of opinion that the record discloses no error of which the defendant can complain.

The judgment of the circuit court is therefore affirmed.

BROOKE, C. J., and MCALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.